IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

IN RE CONCORD EFS, INC., )      No. 02-2697 Ma
SECURITIES LITIGATION     )

ORDER DENYING DEFENDANTS' MOTION TO DISMISS

Before the court is Defendants' May 2, 2003, motion to dismiss Plaintiffs' Consolidated Amended Class Action Complaint under Federal Rule of Civil Procedure 12(b)(6).  Plaintiffs responded on May 30, 2003, and Defendants filed a reply on June 25, 2003.  For the following reasons, Defendants' motion is DENIED.

I.   Overview and Jurisdiction

This case is a securities class action brought under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons who purchased or otherwise acquired shares of common stock of Defendant Concord EFS, Inc. ("Concord" or "the Company") between March 29, 2001, and September 4, 2002 (the "Class Period") and who suffered damages because of Defendants' alleged fraud.  The lead plaintiff in this action is the Milligan Group, which includes J.T. Milligan of Panama City, Florida, who purchased Concord common stock during the Class Period and suffered losses in excess of $3.3 million; James Keith Milligan of Phenix City, Alabama, who suffered losses of approximately $60,000; and J. Curtis Williams of Panama City, Florida, who suffered losses in excess of $361,000.  (Compl.

This document entered on the docket sheet In compliance with Rule 58 and/or 79(a) FRCP on _1- 8-04_

at ¶¶ 15-17.)    Other named plaintiffs are Marc Abrams, Kathy Schmersahl, John and Leslie Norwood, GF Partnership, AVG Limited Partnership, JYG Partnership, Sandford Sadja, and Stanley Sved. (Id. at ¶¶ 18-22.)

Defendant Concord is an electronic transaction processor that acquires, routes, authorizes, captures, and settles virtually all types of electronic payment and deposit access transactions for financial institutions and merchants nationwide.    (Compl. at ¶ 24.) Concord is a Delaware corporation with its principal executive offices located in Memphis, Tennessee.    (Id.)    Plaintiffs have also brought suit against nine of Concord's directors and officers: Dan M. Palmer, the Chairman and Chief Executive Officer; Edward A. Labry, the President of Concord as well as one of its directors; Edward T. Haslam, Senior Vice President, Chief Financial Officer, and Treasurer; Marcia E. Heister, Senior Vice President, General Counsel and Secretary; William E. Lucado, Senior Vice President, Chief Investment and Compliance Officer and Assistant Secretary; Christopher S. Reckert, Chief Marketing Officer; E. Miles Kilburn, Senior Vice President of Business Strategy and Corporate Development; Ronald V. Congemi, a director of the Company; and Richard P. Kiphart, also a director.    Palmer, Labry, Haslam, Heister, Lucado, Reckert, Kilburn, Congemi, and Kiphart are collectively referred to as the "Individual Defendants."

Plaintiffs allege that, during the Class Period, Defendants

2

reported "quarter after quarter of double-digit revenue and earnings growth -- growth fueled primarily by an aggressive acquisition strategy coupled with improper recording and reporting of expenses and earnings." (Compl. at ¶ 2.) The improper recording allegations relate to H&F Services, Inc. ("H&F"), which Plaintiffs assert was an "off-balance sheet related party" used to "control the amount of [Concord's] reported expenses and tweak the amount of its reported revenues." (Id. at ¶ 3.)

Plaintiffs allege that, from 1996 to 2002, H&F served as a conduit for Concord to conceal selling expenses and to acquire contracts and revenue streams for materially less than arm's-length consideration. (Id.) Plaintiffs assert that Concord's accounting of this activity violated Generally Accepted Accounting Principles ("GAAP"), particularly Statement of Financial Accounting Standard 57 ("FASB 57"), under which transactions with related parties must be disclosed in such a way that the full economic realities are apparent, because such transactions are not at arm's length and are therefore subject to manipulation to obtain pre-defined results. (Id.) Plaintiffs allege that Concord improperly treated H&F as an "independent sales organization" rather than the related party it was, so that Concord was able to manipulate its reported earnings and under-report its selling, general, and administrative ("SG&A") expenses throughout the Class Period. Plaintiffs further allege that this improper reporting enabled Concord to promote without proper qualification the success of a "Consolidation Plan"

3

announced at the beginning of the Class Period to manage its growing acquisitions. (Id.)

The Individual Defendants are alleged to have engaged in insider trading during the Class Period, during which Concord's stock value was artificially inflated because of its failure to account properly for H&F. Specifically, Plaintiffs allege that the Individual Defendants and other Concord insiders sold a total of 6,063,084 shares of Concord common stock, with gross proceeds in excess of $182,533,000.00. (Id. at ¶ 10.) After the bulk of the alleged insider stock sales had been completed, Concord formally acquired H&F for $8.9 million and integrated H&F's financial statements with its own, with minimal evident disruption to its Consolidation Plan. (Id. at ¶ 4.) The acquisition, which Plaintiffs allege to be a sham, was stated to be effective January 1, 2002. Plaintiffs allege that, even so, Concord continued to avoid properly disclosing the economic realities of its transactions with H&F throughout the first eight months of 2002.

Plaintiffs allege that, during the Class Period, Concord failed to disclose that it had (1) transferred much of its sales activity to H&F, an undisclosed related party, thus removing substantially all of its selling-related expenses from its income statement, (2) purchased merchant contracts ("revenue streams") from H&F at non-arm's-length prices, and (3) improperly amortized the cost of acquiring these revenue streams over several years. (Id. at ¶ 5.) Plaintiffs allege that, through misleading

4

accounting, Concord artificially managed reported earnings and falsely portrayed a picture of rapid growth and profitability. (Id.)

Plaintiffs also identify multiple statements by Concord alleged to be false and misleading, described fully in the complaint and recounted more briefly here. On March 29, 2001, Concord announced its Consolidation Plan, intended to "expedite the integration of recent network acquisitions," including Star Systems, Inc. ("STAR"), a debit network that Concord had acquired on February 1, 2001. (Compl. at ¶ 53.) The Consolidation Plan included "consolidation of data centers and other facilities to eliminate redundancies; reassignment or termination of certain employees timed to coincide with the integration of redundant processing platforms; and functional integration of the STAR organization into Concord." (Id.) The press release announcing the Consolidation Plan stated that the Company expected to incur a one-time charge between $75 and $90 million in the first quarter of 2001. The press release also quoted Defendant Palmer as stating that Concord's "ongoing focus on reducing our cost per transaction has produced 10% growth annually in operating income per transaction for the last three years," and "[w]e believe that the proactive steps we're announcing today will position us well for continued profitable growth." (Id.) Plaintiffs contend that Palmer's statements were materially false and misleading when made because, unknown to the investing public and undisclosed by

5

defendants, the three-year growth in operating income per transaction was achieved significantly through Concord's inclusion of increasingly greater amounts of H&F-generated revenue streams and the exclusion of H&F-incurred SG&A expenses from the Company's income statement.  (Id.)

On April 26, 2001, Concord announced its first-quarter 2001 results.  A press release stated that the one-time charge associated with the Consolidation Plan was $86.4 million.  (Id. at ¶ 54.)  Defendant Palmer was quoted as saying, "Our first quarter results were excellent, with improvements in both gross margin and operating margin, as expected, coupled with a continued decline in its selling, general, and administrative expenses as a percent of revenue."  (Id.)  The same press release stated, "we're taking steps to eliminate redundancies and capture operating synergies as we integrate our recent acquisitions.  We believe that these elements will combine to position Concord for continued profitable growth in 2001 and beyond."  (Id.)  Plaintiffs allege that these statements were materially false and misleading because the reported improvement in operating margin and the decline in SG&A expenses were achieved by improperly accounting for H&F.  (Id.)

Concord's Form 10-Q filed with the Securities Exchange Commission ("SEC") on August 7, 2001 and signed by Defendants Palmer and Haslam, included the following allegedly misleading statements: (1) "In the second quarter 2001 [SG&A] expenses decreased, as a percent of revenue to 5.4% from 7.1% in the second

quarter 2000 . . . . This decrease is primarily attributable to less direct marketing expense and reduced headcount." (2) "In the opinion of management all adjustments, consisting of normal recurring accruals, considered necessary for a fair presentation have been included." (3) "[T]he increase in operating income resulted from improved economies of scale and declining [SG&A] expenses as a percent of revenue." (Id. at ¶¶ 55-57.)

Similar statements were made throughout the Class Period. An August 30, 2001 press release issued by Concord included statements about the success of the Consolidation Plan. (Id. at ¶ 58.) An October 30, 2001 press release stated that "[o]perating margins remained strong [in the third quarter of 2001] as a result of our company-wide consolidation activities . . . " and "[w]e continue to be successful at managing [SG&A] expenses, which were down year over year for the quarter and year to date, both on an absolute and relative basis." (Id. at ¶ 60.) In a conference call with securities analysts the same day, Defendant Haslam iterated that the consolidation activities favorably affected the SG&A expenses. (Id. at ¶ 61.) On November 9, 2001, Concord filed a Form 10-Q, signed by Defendants Palmer and Haslam, with the SEC, stating that SG&A expenses had decreased, as a percentage of revenue, to 5.1% in 2001 from 6.5% in 2000, and overall had decreased to $22.3 million in the third quarter 2001 from $23.6 million in 2000, and that this decrease was "primarily attributable to less direct marketing expense and reduced headcount." (Id. at ¶ 62.) Plaintiffs contend

7

that the above statements were materially false and misleading when made because Concord failed to disclose that its SG&A expenses were kept artificially low because of its off-the-books, related-party transactions with H&F.

On February 12, 2002, Concord reported results for the fourth quarter and the full year of 2001, and it announced its acquisition of H&F.  It stated:

> In January, 2002, Concord acquired H&F Services, Inc., an independent sales organization, which added approximately 240 experienced sales people to Concord's sales force. The acquisition, which is not expected to have a material impact on operating income, is expected to reduce the average cost of acquiring small merchant accounts and reduce the cost of operations, with an offsetting increase in [SG&A] expenses.

(Compl. at ¶ 66.)  Prior to the acquisition, Concord had amortized over several years the cost of acquiring merchant contracts it purchased from H&F.  After the acquisition, Concord "recognized that, having internalized H&F's functions, it would now have to expense the costs of acquiring merchant contracts through what it now described as its in-house sales force."  (Defs.' Mem. in Supp. of Mot. to Dismiss at 2.)  The February 12, 2002, release stated that Concord's SG&A expenses "continued to decline on an absolute and relative basis, and our company-wide consolidation activities produced cost efficiencies across a growing transaction base[,] result[ing in] sustained profitability growth . . . and an impressive 19% growth in operating income per transaction, excluding charges, in 2001 over 2000."  (Compl. at ¶ 67.)  In a

8

February 12, 2002, conference call, Defendant Labry stated that "margins should benefit from lower overall costs per transaction, driven by scaling and cost[] savings resulting from platform consolidation and elimination of third party contracts." (Id. at ¶ 68.) Plaintiffs assert that the above February 12, 2002, statements (including the characterization of H&F as an "independent sales organization") were materially false and misleading because Concord failed to disclose the relationship between itself and H&F and because there was no reasonable basis for asserting that margins would benefit from overall lower costs. (Id.)

On February 26, 2002, Concord filed a 2001 Form 10-K with the SEC signed by Congemi and Kiphart. (Id. at ¶¶ 32-33.) It included numerous statements alleged to be materially false and misleading: (1) "[SG&A] expenses decreased as a percentage of revenue to 5.3% in 2001 from 6.4% in 2000. The decrease is primarily attributable to lower marketing expense." (2) "On January 1, 2002, we acquired H&F Services, and as a result, our corporate sales force grew to 325 people as of January 31, 2002." (3) The increased sales force "increas[es] our ability to penetrate all tiers of the market more efficiently." (4) "Concord believes that the acquisition will increase Concord's control over the sales channel, including pricing and compensation. The acquisition is expected to reduce the average cost of acquiring merchant contracts, reduce the cost of operations, and increase [SG&A] expenses." (Compl. at ¶¶ 69-

9

72.) Plaintiffs allege that these statements were materially false and misleading because they did not properly disclose the earlier relationship between Concord and H&F and because Concord failed to account for the January 2002 salaries of the H&F sales force, thereby falsely lowering its reported SG&A expenses. Further, in Plaintiffs' view, the acquisition did not increase the number of Concord's sales employees to 325; rather, the same sales employees who had worked for Concord's alleged alter ego before the acquisition continued to work for Concord after the acquisition. Thus, the acquisition did not enable Concord to "penetrate all tiers of the market more efficiently" or "increase Concord's control over the sales channel;" rather, Concord's sales efficiency and control remained the same.

In a press release dated April 30, 2002, Concord announced its results for the second quarter of 2002, in which it stated again that the Consolidation Plan would lead to lower costs. It stated that "[a]lthough we will see a short-term increase in [SG&A] expenses as a result of [the H&F] acquisition, we expect that direct management of this sales channel will produce merchant contracts that are higher quality over the long run." (Id. at ¶ 76.) Plaintiffs allege that this statement was false because Concord failed to disclose that the "short-term" increase in its SG&A expenses was caused by Concord's having to report the previously unreported salaries of a large sales force. (Id.) According to Plaintiffs, this statement was also misleading because

10

H&F and Concord were already related parties and there was no basis for stating that Concord's acquisition of H&F would produce higher quality merchant contracts.  (Id.)

The press release also stated:

A component of the first quarter 2002 charge is a write-off of $14.5 million, net of taxes, of merchant contracts that Concord purchased from H&F Services prior to the acquisition.  As a result of the acquisition these contracts were re-analyzed using a more stringent methodology and subsequently were written off.

(Id. at ¶ 77.)  Plaintiffs contend that this was materially false and misleading because, in fact, the write-off was "strategically effected to reduce SG&A expenses both currently and prospectively and, thus, dull the impact of bringing H&F's SG&A expenses onto the Company's income statement."  (Id. at ¶ 77.)

In a conference call on April 30, 2002, Defendant Palmer told analysts and investors that "the Consolidation we started a year ago is going forward.  We are having excellent results reducing expenses, consolidating centers and absorbing in the first quarter the H&F . . . acquisition.  The outlook from here and the vantage of the first quarter going forward looks good."  (Id. at ¶ 78.)  In the same conference call, Defendant Labry said that, "the trends continue where operating income per transaction continued to rise. Based on the multiple fees per transaction, our lower cost infrastructure and consolidation, and more transactions coming through the pipes on the fixed cost network, we are continuing to see this trend occur."  (Id. at ¶ 79.)  Also during the April 30,

11

2002, conference call, Defendant Haslam said that "the continuation of our consolidation activities bodes well for the continued expansion of our key efficiency measure, operating income per transaction . . . . Looking at SG&A, once again, SG&A declined by nearly 100 basis points on a relative basis. These numbers continue to be favorably impacted by corporate consolidation activities . . . ." (Id. at ¶ 80.) Plaintiffs allege that Palmer's, Labry's, and Haslam's statements in the April 30 conference call were misleading.

On May 9, 2002, Concord filed a Form 10-Q, signed by Defendants Palmer and Haslam, with the SEC. It contained a number of allegedly false and misleading statements, including: (1) "The acquisition [of H&F] was accounted for as a purchase transaction and is immaterial to Concord's financial statements." (2) "Excluding acquisition, restructuring and write-off charges, net income as a percentage of revenue was 18.4% in 2002 compared to 16.1% in 2001. This increase is the result of improved margins, reduced [SG&A expenses] as a percentage of revenue and increased interest income." (Compl. ¶¶ 81, 83.) The Form 10-Q also indicated that Concord wrote off $22.5 million in contract acquisition costs. Plaintiffs allege that these contracts, many of which originated with H&F, either should have been written off previously or should have continued to be amortized over their lives one year at a time rather than expensed in a single reporting period. (Id. at ¶ 84.) Plaintiffs allege that the "strategically timed reduction in SG&A

12

expenses effected by the write-off enabled Concord to misleadingly dull the financial impact of the 'acquisition' of H&F." (Id.)

On July 30, 2002, Concord issued a press release announcing its results for the third quarter of 2002. In this press release, Defendant Labry stated that Concord's recent acquisitions had "produced a short-term increase in [SG&A] expenses on an absolute and relative basis in the second quarter." (Id. at ¶ 88.) Plaintiffs state that this and other statements in the press release were materially false and misleading because they misrepresented essential facts about the economic realities of Concord's use of H&F. (Id.)

On September 5, 2002 (after the July 30, 2002, passage of the Sarbanes-Oxley Act, which tightened the disclosure requirements of the federal securities laws), before the market opened, Concord disclosed that its earnings for the fiscal year 2002 would be lower than expected because of problems integrating its acquisitions, delays in implementing its Consolidation Plan, and increasing SG&A expenses. Concord admitted "acquisition related increases in SG&A" and "a slower-than-expected pace of implementing our large backlog of new business." (Id. at ¶ 89.) In a conference call that day, Defendant Labry noted that bringing H&F onto the Company's books added at least $6 million in SG&A expenses to the Company's income statement. Labry also stated, "I think that we're going to see, you know, two additional quarters of the higher SG&A." (Id. at ¶ 92.) In response to a question about the difference in what had

13

originally been said about the H&F acquisition and what was actually reported, Labry said that Concord now "wanted to . . . get to a more conservative accounting."   (Id.)

The price of Concord's common stock fell from nearly nineteen dollars per share to $12.60 per share on September 5, 2002.   (Id. at ¶ 8.)   On the same day, Concord announced that Palmer, its CEO, was stepping down, "contrary to previous assertions that management would stay in place."   (Id. at ¶¶ 9, 90.)

Plaintiffs brought suit the following day, September 6, 2002, under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),[1] and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.   They allege that the Individual Defendants are liable as controlling persons under Section 20(a) of the Exchange Act, 15 U.S.C 78t(a).[2] Venue is proper in this district under 28 U.S.C. § 1391(b) and section 27 of the Exchange Act, 15 U.S.C. § 78aa.   This court has subject matter jurisdiction under 28 U.S.C. § 1331.

---

[1] Section 78j(b) makes it unlawful to use "in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."   15 U.S.C. § 78j(b).

[2] Section 78t(a) provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."   15 U.S.C. § 78t(a).

14

## II. Applicable Standards

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss the plaintiff's complaint "for failure to state a claim upon which relief can be granted." When considering a 12(b)(6) motion to dismiss, the court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief. Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993); see Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001) (applying 12(b)(6) standard to securities fraud case). "A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

Plaintiffs in federal court are generally required to provide a short, plain statement of their claim sufficient to put the defendant on notice. In a securities fraud action, however, plaintiffs must also "clear additional hurdles at the pleading stage before they are given access to the tools of discovery." In re Petsmart, Inc. Sec. Litig., 61 F. Supp. 2d 982, 988 (D. Ariz. 1999). Specifically, they must satisfy Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constituting fraud or mistake shall be stated with particularity." Additionally, under the Private Securities Litigation Reform Act

15

("PSLRA"), plaintiffs must plead "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78-u4(b)(1). The Fifth Circuit has summarized the requirements as follows:

> [A] plaintiff pleading a false or misleading statement or omission as the basis for a section 10(b) and Rule 10b-5 securities fraud claim must, to avoid dismissal pursuant to Rule 9(b) and 15 U.S.C. §§ 78u-4(b)(1) & 78u-4(b)(3)(A):
>
> (1) specify . . . each statement alleged to have been misleading, i.e., contended to be fraudulent;
> (2) identify the speaker;
> (3) state when and where the statement was made;
> (4) plead with particularity the contents of the false representations;
> (5) plead with particularity what the person making the misrepresentation obtained thereby; and
> (6) explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.
>
> This is the "who, what, when, where, and how" required under Rule 9(b) . . . .

ABC Arbitrage Plaintiffs Group v. Tchuruk, 291 F.3d 336, 350 (5th Cir. 2002). At this stage, the question is not whether the alleged fraudulent practices occurred, but whether the pleadings accusing Defendants of these practices meet the requirements of the PSLRA. In re Cabletron Sys., Inc., 311 F.3d 11, 24-25 (1st Cir. 2002). Although pleading under the PSLRA requires more than notice pleading, "courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss. Such a regime would defeat the remedial goals of the federal securities laws." In re Petsmart, Inc. Sec. Litig., 61 F. Supp. 2d 982, 988 (D. Ariz. 1999).

16

## III. Analysis

To state a claim under section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury. See, e.g., In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999). Defendants move to dismiss on the basis that (1) the complaint does not allege specific facts showing that any statement by Concord was materially false and misleading, and (2) the complaint does not plead with particularity facts that create a strong inference of scienter, the heightened state of mind pleading requirement imposed by the PSLRA.    15 U.S.C. § 78u-4(b)(2).   (Defs.' Mem. in Supp. of Mot. to Dismiss at 4-5.)   They also seek to dismiss the section 20(a) claims because Plaintiffs fail to allege that all of the Individual Defendants are controlling persons of Concord. Each argument will be addressed in turn.

### A.    Alleged False and Misleading Statements

Defendants' argument that Plaintiffs failed to allege materially false and misleading statements includes several sub-arguments, including arguments that (1) Plaintiffs have not adequately pled that H&F was a related party prior to being acquired by Concord; and (2) Plaintiffs fail to establish that Concord's alleged misrepresentations regarding H&F were material.

17

Defendants also argue that Plaintiffs' allegations about Concord's other purportedly false statements, particularly its forward-looking statements, are insufficient. Because that argument overlaps with Defendants' argument about scienter, it will be discussed infra.

### 1.   H&F and Concord as Related Parties

Defendants' first argument is that Plaintiffs' complaint should be dismissed because it fails to set forth sufficient factual allegations showing that Concord and H&F were related parties before Concord's acquisition of H&F. Plaintiffs' complaint asserts that its allegations are based upon "personal knowledge as to those allegations concerning themselves and, as to all other matters, upon information and belief and upon the investigation of counsel."[3] (Compl. at 1.) Their allegations that Concord and H&F were related parties before Concord's acquisition of H&F are based primarily on interviews with former Concord and H&F employees.

The PSLRA provides that, in a section 10(b) action, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made

---

[3] The "investigation of counsel" included review and analysis of public filings made by Concord with the SEC, securities analysts' reports concerning Concord, and press releases and other public statements made by or on behalf of Concord; interviews with individuals who were employed by, or associated with, Concord before and during the Class Period; online research, including review of Concord's website; reference to accounting literature; and consultation with a forensic accounting consultant.

18

on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

Some courts have held that allegations made on "investigation of counsel" are equivalent to those made on "information and belief" for purposes of the pleading requirements of 15 U.S.C. § 78u-4(b)(1). See ABC Arbitrage, 291 F.3d at 351 n.70 (5th Cir. 2002) (citing In re Sec. Litig. BMC Software, Inc., 183 F. Supp. 2d 860, 885 n.33 (S.D. Tex. 2001)). The Fifth and Second Circuits have held that "plaintiffs who rely on confidential sources are not always required to name those sources, even when they make allegations on information and belief . . . " Novak v. Kasaks, 216 F.3d 300, 313 (2d Cir. 2000); see also ABC Arbitrage, 291 F.3d at 351 (adopting Novak's holding). The Novak court noted that "the applicable provision of the law . . . requires plaintiffs to plead only facts and makes no mention of the sources of these facts." Novak, 216 F.3d at 313. The Fifth Circuit stated that "paragraph (b)(1) does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based. Rather, plaintiffs need only plead with particularity sufficient facts to support those beliefs." ABC Arbitrage, 291 F.3d at 352. Where plaintiffs do not name their sources, the sources should be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess

19

the information alleged." Id.

The complaint includes several allegations based on statements from unnamed persons identified by Plaintiffs as "former representatives and managers within Concord's sales organization." (Pls.' Mem. in Opp'n at 6.) Specifically, one former employee of Concord "understood H&F to be the entity used to manage the sales arm of Concord, and [understood] that H&F was set up specifically to conceal financial losses and expenses and to enhance Concord's profits." (Compl. at ¶ 45.) An employee asserted that H&F president John Hannaford worked for Concord before Concord's acquisition of H&F and held himself out as a top executive of Concord as early as April 2000, more than two years before Concord acquired H&F. (Id. at ¶ 46.) The same employee stated that Hannaford had a long-standing association with Defendant Labry, Concord's president. (Id.) According to the complaint, former employees also stated that (1) Labry had set up EFS Card Services, which was listed as a co-debtor on a number of H&F's Uniform Commercial Code ("UCC") filings and, according to Defendants, was a d/b/a for H&F[4] (Compl. ¶¶ 48, 50); (2) Hannaford and Kim Fitzsimmons, both senior executives of H&F (whom former employees understood to have been appointed to their positions by Labry),

---

[4] Although Defendants state that "Plaintiffs' allegations about [the UCC filings are totally inaccurate," (Defs.' Mem. in Supp. of Mot. to Dismiss at 13), and assert that Labry did not found EFS Card Services, Inc., it is not appropriate to resolve this factual dispute at the motion to dismiss stage. Even disregarding the allegations related to H&F's UCC filings, Plaintiffs have alleged sufficient facts demonstrating a triable issue as to whether Concord and H&F were related parties.

20

held themselves out as high-level Concord executives in April 2000 at a sales meeting in Fort Lauderdale, Florida (<u>Id.</u> at ¶¶ 47-48); (3) attendees recalled no mention of H&F at the April 2000 sales meeting in Florida, despite Hannaford's and Fitzsimmons' presence there; (4) although they considered themselves to be Concord employees, a number of individuals found that their payroll checks had been prepared by H&F, which gave at least one individual the impression that H&F was Concord's payroll processing service provider (<u>Id.</u> at ¶ 49); and (5) the payroll checks issued by H&F had the same Memphis address as Concord. Plaintiffs contend that the above allegations, taken together, demonstrate "a blurring of any functional distinction between Concord and H&F among the sales force as well as indicia of Concord's control of H&F through the close working relationship among Labry, Hannaford and Fitzsimmons." (Pls.' Mem. in Opp'n at 7.)

The unnamed former employees, described as "former representatives and managers within Concord's sales organization," would be likely to possess the information alleged. That is, former sales representatives would be likely to know that Hannaford held himself out as a Concord executive before the acquisition, for example, and they would have been likely to attend the sales meeting from which some of the above allegations arise. Further, any former employee would likely know the address printed on the payroll checks.

Taking Plaintiffs' well-pled allegations as true, as the court

must for the purposes of a motion to dismiss, the court finds that the complaint adequately sets forth how H&F was a "related party." As stated in FASB 57, a party is a related party "if it can significantly influence the management or operating policies of the transacting parties." Plaintiffs' allegations, particularly their allegations that Concord President Labry appointed top-level executives at H&F, that H&F employees held themselves out to be Concord executives, and that Hannaford worked for Concord prior to its acquisition of H&F, tend to show that Concord would have had the ability to "significantly influence the management or operating policies" of H&F. FASB 57. Accordingly, Defendants' first argument does not provide a basis on which to dismiss the complaint.

### 2. Materiality of Statements about Transactions with H&F

Defendants next argue that Plaintiffs fail to establish that Concord's alleged misrepresentations regarding transactions with H&F were material. "[I]n order to prevail on a Rule 10b-5 claim, a plaintiff must show that the statements were <u>misleading</u> as to a <u>material</u> fact. It is not enough that a statement is false or incomplete, if the misrepresented fact is otherwise insignificant." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 238 (1988). A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of

22

information made available." <u>Id.</u> at 231-32 (quoting <u>TSC Indus.,</u> <u>Inc. v. Northway, Inc.</u>, 426 U.S. 438, 449 (1976)). Information that "would have assumed actual significance in the deliberations of a reasonable shareholder" is material. <u>TSC Indus. Inc. v.</u> <u>Northway, Inc.</u>, 426 U.S. 438, 449 (1976).

Plaintiffs assert that the question of whether defendants concealed material information is not properly decided in a motion to dismiss. "In general, the materiality of a statement or omission is a question of fact that should normally be left to a jury rather than resolved by the court on a motion to dismiss." <u>Cabletron</u>, 311 F.3d at 34 (citation omitted). <u>See also</u> <u>TSC Indus.</u>, 426 U.S. at 450 ("The issue of materiality [is] a mixed question of law and fact . . . . The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts . . . and these assessments are peculiarly ones for the trier of fact.") Review at this stage, therefore, is only to determine whether the complaint pleads the existence of materially false and misleading statements and presents a plausible jury question of materiality. <u>Cabletron</u>, 311 F.3d at 34.

In their motion to dismiss, Defendants assert that market reactions demonstrate that it was immaterial as a matter of law whether Concord amortized or expensed the contracts it purchased from H&F. Plaintiffs' complaint asserts that the market for Concord common stock was an efficient market. (Compl. at ¶ 114.)

23

Defendants cite In re Burlington Coat Factory Sec. Litig. for the proposition that "[i]n the context of an 'efficient' market, the concept of materiality translates into information that alters the price of the firm's stock."  114 F.3d 1410, 1425 (3d Cir. 1997). They characterize Plaintiffs' claim as a claim that "if the H&F results had been included in Concord's expenses and income, the market would have valued the stock much lower than it did at the time."  (Defs.' Mem. in Supp. of Mot. to Dismiss at 19.)

Defendants refer to Concord's 2001 Form 10-K, filed February 26, 2002, after its acquisition of H&F, which contained the following disclosure:

> We capitalize the cost of purchased merchant contracts . . . purchased merchant contracts are amortized over a useful life of six years based on our attrition experience.  If merchant contracts purchased in 2001 had been expensed, income before taxes would have been reduced by approximately $24.7 million.

(Id. at 20.)  Defendants assert that this disclosure provided shareholders with a clear sense of the impact the H&F acquisition (and its resultant change in accounting for merchant contracts obtained through H&F) would have on Concord's future results by disclosing the way in which Concord's practice of accounting for merchant contracts had affected its 2001 financial statements. (Id.)  Plaintiffs respond, however, that the above statement from the 2001 Form 10-K presents a hypothetical, not an actual calculation for the prior year, as it includes no admission that those costs should have been expensed rather than amortized in 2001

24

and no indication that Concord would be expensing these costs in the future. (Pls.' Mem. in Opp'n to Mot. to Dismiss at 25.) They point out that, when Concord revealed the actual impact in 2002 of its move to a more "conservative" accounting, the stock price dropped dramatically. (Id.)

Plaintiffs next argue that "[t]he materiality of Concord's blatant manipulation of its financials through H&F, set forth in the Complaint, is self-evident." (Pls.' Mem. in Opp'n to Defs.' Mot. to Dismiss at 22.) They allege that, during the Class Period, before the purported acquisition of H&F, Concord purchased revenue streams in the form of merchant contracts from H&F, a related party, and amortized the cost of acquiring these revenue streams over several years. (Compl. at ¶ 5.) Plaintiffs allege that Concord used this method to "add[] H&F's revenue statement to Concord's income statement while concomitantly recognizing only a small portion of the expenses that were associated with the generation of the revenue." (Id. at ¶ 6.)

Plaintiffs do not quantify and plead a precise dollar amount by which Concord allegedly overstated its earnings and understated its SG&A expenses. Defendants assert that the complaint is deficient, stating that Plaintiffs "never once describe the magnitude of Concord's transactions with H&F or the amount by which Concord allegedly misstated its financial results (such as SG&A expenses, operating income, and operating margins)." (Defs.' Mem. in Supp. of Mot. to Dismiss at 17.) Plaintiffs assert, however,

25

that "[t]he documents required to plead with the minute particularity [that] the defendants demand are in the custody and control of defendants, and such particularity is well beyond the pleading standard set forth in the PSLRA." (Pls.' Mem. in Opp'n to Mot. to Dismiss at 24.)  See DiVittorio v. Equidayne Extractive Industries, Inc., 822 F.2d 1242, 1247 (2nd Cir. 1987) (requirements of Rule 9(b) are to be relaxed where the facts are "peculiarly within the opposing parties' knowledge").

Ample authority supports Plaintiffs' position that it is not necessary to quantify the precise amounts by which Concord allegedly overstated its earnings and understated its SG&A expenses.  In In re Computer Associates Class Action Sec. Litig., 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999), Plaintiffs had alleged "such a widespread fraudulent practice, that if true, would have a huge net effect in error as to the company's overall figures and is the type of information peculiarly within the defendants' control." Accordingly, "[u]nknown specifics, such as the exact amount the earnings have been overstated," did not require dismissal.  Id. See also In re First Merchants Acceptance Corp. Sec. Litig., 1998 WL 781118, *9  (N.D. Ill. 1998) (citing cases and stating that "several courts have held that a complaint need not describe each single specific transaction in detail nor allege the precise amount of overstatement on a period by period basis."); Klein v. King, 1990 WL 61950 at *11 (N.D. Cal. 1990) (holding that plaintiff was not required to plead the precise dollar amount of the

26

overstatement of earnings in order to state a claim under Rule 10b-5). As in <u>First Merchants</u>, Plaintiffs here have provided Defendants with fair notice of their claims about improper accounting for H&F, enabling them to prepare a defense. It is clear that Plaintiffs' complaint focuses on contracts obtained from H&F during the Class Period, Concord's accounting of those contracts, and Concord's relationship with H&F prior to the acquisition.

Plaintiffs have also sufficiently alleged that the purported misstatements were material. If their allegations are true, Concord effectively reflected only about one-sixth of its sales costs in a given year for contracts it obtained through H&F while reflecting all of the revenue generated by H&F's sales efforts. (Pls.' Mem. in Opp'n to Mot. to Dismiss at 23.) It is true that the complaint does not quantify the value of the sales contracts Concord obtained through H&F during the Class Period. Even without knowing the amount, however, a reasonable investor would be likely to view this fact as one that "significantly altered the 'total mix' of information made available." <u>Basic</u>, 485 U.S. at 232. Therefore, Defendants' second argument also fails.

### B. Scienter

Defendants also seek to dismiss Plaintiffs' complaint because it does not plead with particularity facts that create a strong inference of scienter. The PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this

27

chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u- 4(b)(2).   "[A] strong inference [is] the most probable of competing inferences." Miller v. Champion Enters. Inc., 346 F.3d 660, 676 (6th Cir. 2003).

There are three different state-of-mind requirements for securities fraud actions, depending on the type of statement at issue, and, in the case of "forward-looking statements," (as defined by the PSLRA[5]) whether the statement was material and accompanied by meaningful cautionary statements. Miller, 346 F.3d at 672; see 15 U.S.C. § 78u-5(c).   First, for "forward-looking statements" that are accompanied by meaningful cautionary language, state of mind is irrelevant. Miller, 346 F.3d at 672; see 15 U.S.C. § 78u-5(c)(1)(A).   Second, with respect to "forward-looking statements" that are not accompanied by meaningful cautionary language, actual knowledge of their false or misleading nature is

---

[5] Under the PSLRA, 15 U.S.C. § 78u-5(i)(1), a "forward-looking statement" is defined as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items; (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer; (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission; (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C); (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

28

required.  Id.; see 15 U.S.C. § 78u-5(c)(1)(B); see also Helwig Vencor, Inc., 251 F.3d 540, 554-55 (6th Cir. 2001) (en banc). Third, for statements of present or historical fact, the state of mind required is recklessness. Helwig, 251 F.3d at 552. Reckless conduct is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." Id. at 550 (quoting Mansbach v. Prescott, Ball, and Turben, 598 F.2d 1017, 1025 (6th Cir. 1979)). "While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." Mansbach, 598 F.2d at 1025.

Showings of motive and opportunity to deceive are relevant in demonstrating scienter. Although "the bare pleading of motive and opportunity" is not sufficient, "facts regarding motive and opportunity may be relevant to pleading circumstances from which a strong inference of fraudulent scienter may be inferred, and may, on occasion, rise to the level of creating a strong inference of reckless or knowing conduct . . . " Comshare, 183 F.3d at 551. The Sixth Circuit en banc elaborated in Helwig: "While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind." 251 F.3d at 550. Further:

> Whether the facts can be said to establish motive, opportunity, or neither, we are directed only to consider whether they produce a strong inference that the defendant acted at least recklessly. This necessarily involves a sifting of allegations in the complaint. As

29

we have noted, recklessness in securities fraud is an untidy-case-by-case concept. Mansbach, 598 F.2d at 1025. Accordingly, facts presenting motive and opportunity may be of enough weight to state a claim under the PSLRA, whereas pleading conclusory labels of motive and opportunity will not suffice. Comshare, 183 F.3d at 551.

Helwig, 251 F.3d at 551. Congress "plainly contemplated that scienter could be proven by inference, thus acknowledging the role of indirect and circumstantial evidence." Id. (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 195 (1st Cir. 1999)). A showing of insider trading at an unusual time or in a suspicious amount is also relevant to scienter. Id. at 552 (citing Greebel, 194 F.3d at 196).

Plaintiffs' complaint alleges the following facts related to scienter. Because of their Board memberships and/or positions with Concord, each of the Individual Defendants had access to non-public information that could adversely affect the price of Concord's stock (through, for example, access to internal corporate documents, conversations with corporate officers or employees, and attendance at management and/or Board of Directors' meetings). (Compl. ¶ 104.) Additionally, the Individual Defendants, because of their positions, controlled the contents of quarterly and annual reports, press releases, and presentations to securities analysts and investors. (Id. at ¶ 106.) Plaintiffs allege that the Individual Defendants were motivated to inflate the price of Concord securities in order to (a) protect and enhance their executive positions; (b) enhance the value of their personal

30

holdings of Concord common stock; (c) allow the Individual Defendants to sell 6,063,084 shares of Concord stock at artificially inflated prices producing over $182.533 million in proceeds; and (d) use the Company's grossly inflated common stock as currency in acquiring other businesses.  (Id. at ¶ 110.)

### 1.    Forward-Looking Statements

Defendants argue that Plaintiffs failed to allege facts sufficient to raise a strong inference that any of the Defendants had actual knowledge of the falsity of any forward-looking statements.  (Defs.' Mem. in Supp. of Mot. to Dismiss at 38-40.) They identify paragraphs 53, 54, 66, 68, 72, and 76, as containing forward-looking statements.[6]    (Defs.' Reply Mem. at 14.) Additionally, they argue that their forward-looking statements were accompanied by meaningful cautionary language.

Paragraph 53 discusses the March 29, 2001 press release, which announced the Consolidation Plan.  It included Defendant Palmer's statements that Concord's "ongoing focus on reducing our cost per transaction has produced 10% growth annually in operating income per transaction for the last three years" and "[w]e believe that the proactive steps we're taking today will position us well for continued profitable growth."  Plaintiffs allege that this press release was materially false and misleading because the three-year growth in operating income per transaction had been achieved

---

[6] These paragraphs describe the statements made on March 29, 2001; April 26, 2001; February 12, 2002; February 26, 2002; and April 30, 2002.

principally through improper accounting of transactions with H&F. Paragraph 54 of the complaint discusses the April 26, 2001 press release, which announced progress in the Consolidation Plan and a continued decline in Concord's SG&A expenses. It stated that results were "excellent" in the first quarter of 2001, "with improvements in both gross margin and operating margin, as expected, coupled with a continued decline in [SG&A] expenses as a percent of revenue." (Compl. ¶ 54.) It also included statements that Concord was taking steps to "eliminate redundancies and capture operating synergies as we integrate our recent acquisitions," and "[w]e believe that these elements will combine to position Concord for continued profitable growth in 2001 and beyond." Defendants argue that both statements about Concord's being "positioned" for "continued profitable growth" are mere puffery that is not actionable, citing In re Royal Appliance Sec. Litig., 1995 WL 490131, *3 (6th Cir. Aug. 15, 1995) ("Allegations that a company engaged in general puffery [are] insufficient to claim securities fraud.") Even if certain statements in the press releases are mere "puffing," however, the press releases as a whole are not puffery because they include statements upon which a reasonable investor could rely. Further, the isolated statements about being positioned for continued growth are not "forward-looking" within the meaning of the PSLRA safe harbor provision because they are closely tied to assertions about the present. Statements based on present facts, even if they have a forward-

32

looking component, are not protected by the safe harbor provision.
Grossman v. Novell, Inc., 120 F.3d 1112, 1123 (10th Cir. 1997)
(where "several of the allegedly misleading statements referred to
then present factual conditions, or implied background factual
assumptions a reasonable investor would regard the speaker as
believing to be true," safe harbor provision did not apply).

Defendants also argue that Concord's statements that the H&F
acquisition was expected to (1) reduce costs (Compl. ¶¶ 66, 68,
72); (2) produce higher quality contracts (id. at ¶ 66); (3) have
no material effect on operating income (id.), and (4) increase SG&A
expenses in the short term (id. at ¶ 66, 72, 76) are forward-
looking and non-actionable.    Plaintiffs allege that these
statements were materially false and misleading because Defendants
knew that H&F was already a related party and that the acquisition
was actually likely to increase costs, affect operating income, and
to increase SG&A expenses beyond the short term.    In other words,
Plaintiffs argue that the above statements were misleading because
they did not disclose the nature of Concord's relationship with H&F
before the acquisition.    Affirmative statements, even if "forward-
looking", are not protected by the safe harbor provision if they
omit material facts.    In re MobileMedia Sec. Litig. 28 F. Supp. 2d
901, 930 (D.N.J. 1998) ("Allegations based upon omissions of
existing facts or circumstances do not constitute forward looking
statements protected by the safe harbor of the Securities Act.");
In re ValuJet, Inc. Sec. Litig., 984 F. Supp. 1472, 1479 (N.D. Ga.

33

1997) (refusing to apply safe harbor provision because plaintiffs alleged failure to disclose existing facts). These statements, therefore, are not protected by the PSLRA safe harbor.[7]

## 2. Statements of Present or Historical Fact

Having decided that Defendants' statements are not protected by the PSLRA safe harbor, it is necessary to determine whether Plaintiffs have adequately pled that Defendants were at least reckless when making the statements at issue.

The complaint alleges that the Individual Defendants had access to accurate information because of their positions as senior officers or directors of Concord and knew or should have known that Concord's financial statements were false and overstated because of their failure to disclose that Concord had transferred much of the cost of its sales activity to an undisclosed related party. Further, the complaint alleges that they had motives to deceive, including the desire to enhance the value of their personal holdings of Concord common stock and to engage in insider trading. Where stock sales were suspicious in timing or amount, they give

---

[7] Even assuming these statements are forward-looking under the PSLRA, Plaintiffs' allegations are sufficient to establish that Defendants acted with actual knowledge in making the statements. Additionally, Defendants argue that "cautionary" statements found at the end of its press releases and SEC filings immunize it from liability for forward-looking statements. (Defs.' Mem. in Supp. of Mot. to Dismiss at 29-30.) This argument is unavailing. In order to protect defendants from liability, the cautionary language must be "tailored to the specific future predictions, estimates, or opinions" alleged to be misleading. Harden v. Raffensperger, Hughes & Co., Inc., 65 F.3d 1392, 1404 (7th Cir. 1995) (quoting In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 371-72 (3d Cir. 1993)). None of the statements provided by Defendants is sufficiently specific or "tailored" to relieve Defendants of liability for their purportedly forward-looking statements.

34

rise to an inference of scienter. Helwig, 251 F.3d at 552 (stating that one factor relevant to scienter is "insider trading at a suspicious time or [in] an unusual amount"). Plaintiffs allege that the Individual Defendants' stock sales were "highly unusual" and "not consistent with their prior sales." (Compl. ¶ 112.) The complaint states in detail the Individual Defendants' stock sales: Palmer sold 1.5 million shares for proceeds of $44,046,725; Labry sold 1.5 million shares for proceeds of $44,233,038.04; Haslam sold 199,250 shares for proceeds of $7,509,096.25; Lucado sold 157,932 shares for proceeds of $5,161,800; Heister sold 70,000 shares for proceeds of $2,047,500; Reckert sold 269,060 shares for proceeds of $7,610,000; Kilburn sold 166,310 shares for proceeds of $5,999,175; Congemi sold 419,412 shares for $13,261,000; and Kiphart sold 1,781,300 shares for proceeds of $52,665,546. (Id. at ¶ 111.) Plaintiffs also allege that the timing was suspicious in that all of Palmer's and Labry's sales, for proceeds of over $88 million combined, were effected between November 1, 2001 and December 18, 2001 -- after the positive third-quarter 2001 results were announced and just before the purported acquisition of H&F was announced. (Pls.' Mem. in Opp'n to Mot. to Dismiss at 44.)

Defendants argue that the Complaint is insufficient because it does not reveal their total stock holdings or trading history. Arguing that "the inference of scienter is weak where an officer sells only a small fraction of the shares owned," In re Credit Acceptance Corp. Sec. Litig., 50 F. Supp. 2d 662, 677 (E.D. Mich.

35

1999), they state that Palmer's, Labry's, and Kiphart's trades constituted only 14%, 16%, and 17% of their holdings, respectively. (Defs.' Mem. in Supp. of Mot. to Dismiss at 43.) Plaintiffs respond by citing several cases in which the sale of similar percentages of insiders' holdings have been held to raise an inference of scienter. See, e.g., In re Guilford Mills, Inc. Sec. Litig., 1999 WL 33248953, *5 (S.D.N.Y. 1999) (finding complaint sufficient where it alleged that four directors sold 10% of their holdings during the class period for aggregate proceeds of over $6.5 million). In view of these authorities, and in view of the large cumulative volume of the sales, $182 million, the timing of the trades, and Plaintiffs' allegations that Defendants knew both Concord's true financial condition and the contents of Concord's statements, Plaintiffs have adequately alleged scienter.

## C.    Section 20(a) Claims

Count II of the complaint asserts a claim against each of the Individual Defendants under section 20(a) of the Exchange Act, which makes "controlling persons" jointly and severally liable for primary violations by persons under their control. 15 U.S.C. § 78t(a). Defendants argue that this claim should be dismissed because Plaintiffs have not stated a claim for underlying violations of section 10(b) or Rule 10b-5. Because the court has already decided that Plaintiffs do state a claim for those violations, this argument fails.

Alternatively, Defendants argue that Plaintiffs insufficiently

36

alleged that certain Individual Defendants are "controlling persons" of Concord for purpose of the section 10(b) and Rule 10b-5 claims. (Defs.' Mem. in Supp. of Mot. to Dismiss at 47.) The Sixth Circuit "has not adopted a test for liability as a 'controlling person' under the securities laws." Sanders Confectionery Prod., Inc. v. Heller Fin., Inc., 973 F.2d 474, 486 (6th Cir. 1992). It has noted, however, that plaintiffs must establish at least (a) that the Individual Defendants actually participated in (i.e., exercised control over) the operations of the violator in general, and (b) that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated. Id. (citing Metge v. Baehler, 762 F.2d 621, 631 (8th Cir. 1985)).

Defendants seek to dismiss the section 20(a) claims against Heister, Lucado, Reckert, Kilburn, Congemi, and Kiphart. (Defs.' Mem. in Supp. of Mot. to Dismiss at 48.) As noted, Heister was Senior Vice President, General Counsel and Secretary; Lucado was Senior Vice President, Chief Investment and Compliance Officer and Assistant Secretary; Reckert was Chief Marketing Officer; and Kilburn was Senior Vice President of Business Strategy and Corporate Development. Congemi and Kiphart were both outside directors of Concord, and both signed Concord's 2001 Form 10-K.

Plaintiffs have stated a claim for section 20(a) violations as to those Individual Defendants. As noted, Plaintiffs stated a claim for underlying violations, namely Concord's alleged

37

violations of section 10(b) and Rule 10b-5. Plaintiffs have also alleged that the Individual Defendants exercised control over Concord. "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise.'" Gabriel Capital, L.P. v. NatWest Fin., Inc., 2000 U.S. Dist. LEXIS 15180, at *53 (S.D.N.Y. Oct. 13, 2000) (citation omitted). The Individual Defendants other than Congemi and Kiphart exercised control over Concord's operations in general by virtue of their high-ranking management positions, which involved oversight of the Company. By alleging that Congemi and Kiphart served on the Board of Directors and held substantial ownership shares in Concord, Plaintiffs also sufficiently allege that those Individual Defendants had the ability to control the operations of the Company. The fact that they signed the 2001 Form 10-K provides evidence of their degree of involvement. Finally, because the complaint states that all Individual Defendants controlled the contents of the Concord quarterly and annual reports and press releases and were privy to adverse non-public information about Concord by way of access to internal company documents, communications with other officers and directors, and attending board meetings, Plaintiffs have sufficiently alleged that the Individual Defendants possessed the power to control the specific transactions and allegedly misleading statements upon which

38

Plaintiffs' claims are based.

## IV.   Conclusion

For the foregoing reasons, Defendants' motion to dismiss is DENIED in its entirety.

So ORDERED this 7th day of January 2004.


_____
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 92 in case 2:02-CV-02697 was distributed by fax, mail, or direct printing on January 8, 2004 to the parties listed.

---

B. J. Wade
GLASSMAN EDWARDS WADE & WYATT, P.C.
26 N. Second Street
Memphis, TN 38103

William S. Lerach
MILBERG WEISS BERSHAD HYNES & LERACH
401 B St.
Ste. 1700
San Diego, CA 92101

Darren J. Robbins
MILBERG WEISS BERSHAD HYNES & LERACH
401 B St.
Ste. 1700
San Diego, CA 92101

Andrew J. Brown
MILBERG WEISS BERSHAD HYNES & LERACH
401 B St.
Ste. 1700
San Diego, CA 92101

George E. Barrett
BARRETT JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201

Douglas S. Johnston
BARRETT JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201

Timothy L. Miles
BARRETT JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201

Henry Rosen
MILBERG WEISS BERSHAD HYNES & LERACH, LLP
600 West Broadway
Ste. 1800
San Diego, CA 92101

Mark E. King
DAVID B. KAHN & ASSOCIATES, LTD.
One Northfield Plaza
Suite 100
Northfield, IL 60093

David B. Kahn
DAVID B. KAHN & ASSOCIATES, LTD.
One Northfield Plaza
Suite 100
Northfield, IL 60093

Rachel M. Blum
SIDLEY AUSTIN BROWN & WOOD
Bank One Plaza
10 S. Dearborn St.
Chicago, IL 60603

William F. Conlon
SIDLEY AUSTIN BROWN & WOOD
Bank One Plaza
10 S. Dearborn St.
Chicago, IL 60603

Gerard D. Kelly
SIDLEY AUSTIN BROWN & WOOD
Bank One Plaza
10 S. Dearborn St.
Chicago, IL 60603

David F. Graham
SIDLEY AUSTIN BROWN & WOOD
Bank One Plaza
10 S. Dearborn St.
Chicago, IL 60603

Nathan A. Bicks
BURCH PORTER & JOHNSON
130 N. Court Avenue
Memphis, TN 38103

W.J. Michael Cody
BURCH PORTER & JOHNSON
130 N. Court Avenue
Memphis, TN 38103

Jef Feibelman
BURCH PORTER & JOHNSON
130 N. Court Avenue
Memphis, TN 38103

Scott J. Crosby
BURCH PORTER & JOHNSON
130 N. Court Avenue
Memphis, TN 38103

Fred Taylor Isquith
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Ave.
New York, NY 10016

Gustavo Bruckner
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Ave.
New York, NY 10016

Katherine B. Dubose
WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
270 Madison Ave.
New York, NY 10016

Paul Kent Bramlett
LAW OFFICE OF PAUL BRAMLETT
P.O. Box 150734
Stouffer Tower
Nashville, TN 37215

Charles J. Piven
LAW OFFICES OF CHARLES J. PIVEN
The World Trade Cent
401 E. Pratt St.
Ste. 2525
Baltimore, MD 21202

Wade B. Cowan
LAW OFFICES OF WADE B COWAN
404 Georgetown Drive
Nashville, TN 37205

Daniel E. Bacine
BARRACK RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

Mark R. Rosen
BARRACK RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

Jeffrey A. Barrack
BARRACK RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103

Ronald D. Krelstein
LAW OFFICE OF RONALD D. KRELSTEIN
7515 Corporate Centre Drive
Germantown, TN 38138

John M. Elliott
ELLIOTT REIHNER SIEDZIKOWSKI & EGAN PC
Union Meeting Corporate Center V
925 Harvest Dr.
Blue Bell, PA 19422

Joseph C. Kohn
KOHN SWIFT & GRAF PC
One South Broad Street
Ste. 2100
Philadelphia, PA 19107

William E. Hoese
KOHN SWIFT & GRAF PC
One South Broad Street
Ste. 2100
Philadelphia, PA 19107

Honorable Samuel Mays
US DISTRICT COURT